UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II) | ) NO. 3:23-md-03071<br>) MDL No. 3071<br>)<br>) THIS DOCUMENT RELATES TO:<br>) 3:23-cv-00792 |

## MEMORANDUM OPINION

Defendant TREV Management II LLC ("TREV") has filed a Motion to Dismiss the Student Plaintiffs' First Amended Complaint (Doc. No. 576). Student Plaintiffs filed a Response (Doc. No. 615), and TREV filed a Reply (Doc. No. 638). The motion is ripe for review. For the reasons that follow, the Court will grant TREV's Motion.

### BACKGROUND

The following allegations are taken as true from Student Plaintiffs' First Amended Complaint ("Student Complaint") (Doc. No. 527) and are considered to be true to resolve the pending motion.

RealPage, Inc. ("RealPage") provides revenue management software that "collects real-time pricing and supply levels" from its clients, who are horizontal competitors in the student housing market. (Doc. No. 527 ¶ 5). RealPage then "compiles this data into a common algorithm that sends the participants . . . unit-specific pricing and supply recommendations." (Id.). RealPage rolled out its first revenue management software, YieldStar, after acquiring it from Camden Property Trust in 2002. (Doc. No. 527 ¶ 39). In 2009, RealPage launched its first revenue management software aimed at the student housing market, YieldStar Student Housing ("YieldStar Student"). (Doc. No. 527 ¶ 40). Today, RealPage operates a full suite of revenue management

1

services for student housing, including YieldStar Student, RealPage Student Revenue Management ("Student RPRM"), and Student Lease Rent Options ("Student LRO") (collectively, the "Student Revenue Management Solutions" or "Student RMS"). (Id. ¶ 4).

RealPage's student housing clients include large property managers and lessors of student housing ("Lessors"). (Id. ¶ 3). These companies are horizontal competitors. (Id. ¶ 230). In 2019, YieldStar Student had more than 50 clients with more than three million rental units. (Id. ¶¶ 46-47).

Student Plaintiffs allege that RealPage and its clients have formed an illegal price-fixing cartel. (See Doc. No. 527 ¶¶ 118, 156). It begins when RealPage touts its ability to help clients obtain the optimized price for student housing units regardless of market forces. RealPage's clients, including the Defendants, each separately contract with RealPage, paying RealPage annual license fees as well as periodic fees and providing RealPage their commercially sensitive pricing and supply data. (Doc. No. 527 ¶¶ 9, 276). RealPage then applies its revenue management algorithm to this data pool of competitor information to determine optimal rent pricing for RealPage clients' student apartment units in each of the markets where those clients are located. (Doc. No. 527 ¶ 9). Not all RealPage clients utilize RealPage's entire suite of RMS services; while Student Plaintiffs allege most student housing clients use only YieldStar Student, they also allege that at least Greystar uses other student housing RMS through RealPage in addition to YieldStar Student. (Doc. No. 527 ¶¶ 56, 58-60).

Student Plaintiffs allege that RealPage's student housing RMS "provide[s] the platform and the algorithms for collusion," (id. ¶ 9), giving its clients "the unprecedented ability to facilitate collaboration among operations and track [the] competition's rent with precision," (id.). They do this by collectively agreeing to price their rental units in accordance with RealPage's RMS

recommendations. (Doc. No. 527 ¶¶ 6, 67). This collective behavior, driven by RealPage's pricing recommendations, has "giv[en] Lessor Defendants the courage to charge inflated prices with the implicit assurance that all of their competitors will do the same." (Id. ¶ 9). This has resulted in higher rents among the Lessor Defendants' student housing properties than properties not using RealPage. (Id. ¶ 10). A regression analysis conducted on student housing in four cities of properties using RealPage RMS "estimated an average overcharge of 10.9% on properties that were priced using YieldStar Student . . ." (Doc. No. 527 ¶ 141).

**LEGAL STANDARD**

To survive a motion to dismiss for failure to state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In reviewing a motion to dismiss, the Court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." Courtright v. City of Battle Creek, 839 F.3d 513, 518 (6th Cir. 2016). However, the Court will "disregard bare legal conclusions and naked assertions" and "afford[] the presumption of truth only to genuine factual allegations." Dakota Girls, LLC v. Philadelphia Indem. Ins. Co., 17 F.4th 645, 648 (6th Cir. 2021) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2007)) (internal quotations omitted). Nor can the Court "credit a threadbare recital of the elements of a cause of action ... supported by mere conclusory statements." Dakota Girls, 17 F.4th at 648 (citing Iqbal, 556 U.S. at 678)) (internal quotations omitted). To avoid dismissal under Rule 12(b)(6), a complaint must contain either direct or inferential allegations with respect to all material elements of each claim. Wittstock v. Mark A. Van Sile, Inc., 330 F.3d 899, 902 (6th Cir. 2003).

## ANALYSIS

To state a plausible claim under Section 1 of the Sherman Act, a plaintiff must allege three elements: 1) the existence of a contract, combination, or conspiracy among two or more separate entities that 2) unreasonably restrains trade and 3) affects interstate or foreign commerce. See Hobart-Mayfield, Inc. v. National Operating Committee on Standards for Athletic Equipment, 48 F.4th 656, 663 (6th Cir. 2022). A plaintiff must specifically allege each defendant's participation in the conspiracy. Jones v. Varsity Brands, LLC, 618 F. Supp. 3d 713, 723 (W.D. Tenn. 2022). A conspiracy cannot exist solely between a parent and its wholly owned subsidiary because they have "a complete unity of interest." Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984). A parent corporation may, however, be accountable for Sherman Act violations of its subsidiary if it participated in the conspiracy beyond "mere ownership." Jones, 618 F. Supp. 3d at 722-23, 725.

TREV argues that Student Plaintiffs have not alleged any participation by TREV in the alleged conspiracy aside from its ownership of BH Management Services LLC and B.HOM Student Living. (Doc. No. 579 at 4). Specific to TREV, Student Plaintiffs allege that TREV owns, as its affiliate, B.HOM Student Living ("B.HOM"), a client of RealPage.[1] (Doc. No. 527 ¶ 30). In fact, their only allegations against TREV are contained in two paragraphs of their 107-page complaint:

---

[1] B.HOM Student Living is also a defendant in this action.

> Lessor Defendant Timerline Real Estate Ventures LLC ("TREV") is a privately held real estate operator and investment manager focused on the residential sector that has acquired more than $2.8 billion of total investment since its inception in 2012. TREV specializes in the development, acquisition, and operation of student housing, multifamily, and mixed-use retail/residential communities, and utilizes its fully integrated property management team through its owned affiliate B.HOM Student Living with partner, BH Management Services. TREV is headquartered in Rye, New York.

(Id. ¶ 56).

> **TERV [sic], B.HOM Student Living, and BH Management.** Timberline Real Estate Ventures, B.HOM Student Living, and BH Management Services used RealPage to set prices for student housing above competitive rates. Since approximately 2020, B.HOM has been a wholly owned affiliate of Defendant Timberline Real Estate Ventures. RealPage has created a special private website for BH Management called "BH Corporate University" that it uses to train BH managers in how to use the RealPage revenue management software. Sierra Garza, the Senior Revenue Manager for BH Management, credited RealPage for providing data that "yields a better performance."

(Id. ¶ 57). Those two paragraphs do not raise any plausible allegation of independent action in the conspiracy beyond "mere ownership" of B.HOM. Jones, 618 F. Supp. 3d at 722-23.

Perhaps knowing that their allegations against TREV are insufficient, Student Plaintiffs argue that regardless of its role in the conspiracy, TREV can be sued as part of "one economic entity" with B.HOM. (Doc. No. 615 at 1). They derive this argument from Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752 (1984). In Copperweld, the Supreme Court held "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act." Id. at 771. Student Plaintiffs argue that a logical conclusion of Copperweld's holding is that parent companies are liable alongside their wholly-owned subsidiaries for the anticompetitive conduct of those subsidiaries. (Doc. No. 615 at 6). They are not the first to advance this "single entity" argument.

In Arandell Corp. v. Centerpoint Energy Services, Inc., 900 F.3d 623 (9th Cir. 2018), the Ninth Circuit addressed this "novel" approach to Copperweld. Id. at 630. Likewise, in Lenox

5

MacLaren Surgical v. Medtronic, Inc., 847 F.3d 1221 (10th Cir. 2017), the Tenth Circuit addressed this "somewhat unusual[] antitrust theory." Id. at 1230. Student Plaintiffs argue that the Arandell and Lenox courts adopted a "single enterprise" doctrine, which Student Plaintiffs claim requires courts to treat the actions of "a parent company and wholly-owned subsidiary [with] already-converged goals . . . as that of a single enterprise." (Doc. No. 615 at 5 (quoting Jones, 618 F. Supp. 3d at 722)). Implicit in Student Plaintiff's interpretation of the single enterprise doctrine is their argument that they need not plead any independent action on the part of TREV because it owns B.HOM. (Doc. No. 615 at 5-7).

Student Plaintiffs' interpretation of the single enterprise doctrine and the Arandell and Lenox cases is strained at best. In Arandell, the plaintiffs "alleged that natural gas traders manipulated the price of natural gas by reporting false information to price indices published by trade publications and engaging in wash sales." Arandell, 900 F.3d at 627. Reliant Energy, Inc. ("Reliant"), one of the defendants, "admitted to engaging in wash trades during the Class Period" and settled with government agencies during the investigations "regarding its manipulative trading practices." Id. at 627-28. Reliant owned CenterPoint Energy Services, Inc. ("CES"). Id. at 627. The plaintiffs also sued CES, alleging it was part of Reliant's scheme. Id. The issue in Arandell was not whether the CES acted in furtherance of the conspiracy; there was no dispute that the CES "sold natural gas and related services to commercial and industrial customers" during the class period. Id. at 627. Instead, the issue was whether CES had the requisite knowledge that its actions were part of Reliant's antitrust conspiracy. Id. at 628.

The Ninth Circuit held that a subsidiary "cannot innocently advance a[] [parent's] anticompetitive scheme." Id. at 630-31. In doing so, the court found that an "inescapabl[e] . . . corollary conclusion" of Copperweld was that "for antitrust purposes, it is legally impossible for

firms within a single 'economic unit' to act together in furtherance of the same price-fixing scheme for independent and distinct purposes." Id. Stemming from this conclusion, the court held that "a subsidiary . . . as a matter of law *cannot* innocently advance an anticompetitive scheme . . . for a legitimate business purposes, while its parent and sister companies purposely advance the very same scheme." Id. at 631 (emphasis in original).

Arandell does not help Student Plaintiffs here. In contrast to Arandell, TREV's motion argues that Student Plaintiffs have not alleged any conduct on its part in furtherance of the alleged conspiracy. (Doc. No. 579 at 3). Student Plaintiffs ask the Court to ascribe B.HOM's conduct to TREV. But they have not adequately alleged any facts to advance such an inference, as the plaintiffs did in Arandell. In short, there are no factual allegations that TREV acted in furtherance of the conspiracy or that it did anything to accomplish B.HOM's alleged anticompetitive conduct. Applying Arandell's analysis, the Student Complaint fails to state a claim.

Lenox is even less helpful to the Student Plaintiffs' arguments. In that case, Lenox MacLaren Surgical Corporation ("Lenox") sued several related corporations alleging monopolization of the market for certain surgical tools under Section 2 of the Sherman Act. Lenox, 847 F.3d at 1226. The district court granted summary judgment, holding that "because Lenox could not establish each of the elements of an antitrust claim against any one defendant, or establish a conspiracy among them, Lenox's claims fail as a matter of law." Id. On appeal, Lenox argued that the lower court:

> erred by construing its claims of monopolization . . . as a claim of conspiracy to monopolize, which requires proof of an agreement among the co-conspirators. Lenox maintain[ed] instead that Defendants [we]re a 'single enterprise' for purposes of antitrust analysis. As a result, Lenox claim[ed] it was entitled to pursue non-conspiracy § 2 claims based on Defendants' aggregate conduct.

Id. at 1230 (internal citation omitted). The Tenth Circuit agreed with Lenox's single enterprise argument but affirmed on other grounds. Id. at 1226.

7

The Lenox court did not adopt Student Plaintiffs' "single enterprise" approach. In fact, the court explicitly held that its opinion should not "be read to suggest that a corporation can be held liable under § 2 [of the Sherman Act] for the anticompetitive conduct of one or more related entities, merely by virtue of its place in the same corporate family." Id. at 1237. That is exactly what Student Plaintiffs ask the Court here to do: substitute their burden to plead TREV's independent anticompetitive conduct with a simple allegation that TREV owns B.HOM. (See Doc. No. 527 ¶ 30). Thus, neither Lenox nor Arandell allows plaintiffs to sue a parent company under Section 1 of the Sherman Act without pleading any independent action on the part of that parent.

Student Plaintiffs concede that the Sixth Circuit has not adopted an approach to Sherman Act liability that allows them to hold parent companies liable without pleading any independent conduct. (See Doc. No. 615 at 7). Indeed, courts in this Circuit hold that "[w]hile application of Copperweld requires viewing the [parent company] as a joint enterprise with [its wholly owned subsidiary], a plaintiff asserting a § 1 or § 2 claim under the Sherman Act must still provide evidence that each defendant independently participated in the enterprise's scheme, to justify holding that defendant liable as part of the enterprise. This involvement must be more than mere ownership." Jones v. Varsity Brands, LLC, 618 F. Supp. 3d 713, 723 (W.D. Tenn. 2022) (quoting Arandell, 900 F.3d at 631).

The other cases Student Plaintiffs cite to support their single enterprise theory are equally unpersuasive. In Jones v. Varsity Brands, LLC, the plaintiffs alleged that one of the defendants, Bain Capital, which acquired Varsity Brands, held a seat on Varsity Brands' board of directors and funded its allegedly anticompetitive acquisitions and thus had taken action beyond mere ownership to further the conspiracy. 618 F. Supp. 3d at 724-25. Student Plaintiffs make no similar allegations

8

against TREV here. Similarly, in In re Aluminum Warehousing Antitrust Litigation, 2015 WL 6472656 (S.D.N.Y. Oct. 23, 2015), the court dismissed claims against an agent of a corporation because the plaintiffs only alleged anticompetitive conduct of the corporation, not the agent. 2015 WL 6472656, at *16. Finally, Mt. Pleasant v. Associated Electric Cooperative, Inc., 838 F.2d 268 (8th Cir. 1988), concerned a completely different issue than the case at hand. There, the court found that "the logic of Copperweld reaches beyond its bare result" that "no such plurality exists between a corporation and its wholly owned subsidiary." Id. at 274. But that case involved a cooperative of electrical corporations, and "there [wa]s no evidence that any defendants ever pursued interests antithetical to those of the cooperative as a whole." Id. at 276. It is hardly surprising that the Eighth Circuit found a likeness to Copperweld's parent/subsidiary holding in this cooperative/member scenario. Here, Student Plaintiffs don't ask the Court to extend Copperweld to an analogous scenario. Instead, they ask the Court to erase the independent action distinction in cases brought under the Sherman Act.

As TREV argues, "[i]t is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." Chism v. Chemring N. Am. Grp., Inc., 2015 WL 8207899, at *2 (W.D. Tenn. Dec. 7, 2015) (quoting United States v. Bestfoods, 524 U.S. 51, 61 (1998)). (See also Doc. No. 579 at 4). That principle is not altered in the antitrust context. For example, in Cupp v. Alberto-Culver USA, Inc., 310 F. Supp. 2d 963 (W.D. Tenn. 2004), the court dismissed a Sherman Act § 1 claim against two defendants whom the plaintiff sued "only because of their corporate relationship to [another defendant]" because "mere existence of a corporate relationship [does not] implicate a parent in its subsidiary's actions." Id. at 973-74. It is true that "[i]f private plaintiffs, who do not have access to inside information, are to pursue violations of the law, the pleading standard must

take into account the fact that a complaint will ordinarily be limited to allegations pieced together from publicly available information." In re Broiler Chicken Antitrust Litigation, 290 F. Supp. 3d 772, 804 (N.D. Ill. 2017). But Student Plaintiffs have not even met the "publicly available information" standard in their allegations against TREV. Because Student Plaintiffs have not alleged any independent conduct in the conspiracy by TREV, their claims against TREV must be dismissed.

An appropriate order will be entered.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE