## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II) | ) ) ) ) ) | NO. 3:23-md-03071 MDL No. 3071 **THIS DOCUMENT RELATES TO:** ALL CASES |

## MEMORANDUM OPINION

Pending before the Court is Defendants Apartment Management Consultants, LLC ("AMC"), Avenue5 Residential, LLC ("Avuenue5"), Bozzuto Management Company ("BMC"), First Communities Management, Inc. ("FMC"), FPI Management, Inc. ("FPI"), Pinnacle Property Management Services, LLC ("Pinnacle"), Rose Associates, Inc. ("Rose"), and ZRS Management, LLC's ("ZRS") (collectively, the "Property Management Defendants" or "PMDs") Motion to Dismiss for Failure to Plead Agency Liability. The Motion has been fully briefed (Doc. Nos. 584, 613, 640), and is ripe for review. For the reasons that follow, the Court will deny the motion.

## BACKGROUND

The following allegations from Multifamily Plaintiffs' Second Amended Complaint ("Multifamily Complaint") (Doc. No. 530) are considered as true to resolve the pending motion.

RealPage, Inc. ("RealPage") developed an "integrated technology platform that provides software solutions for the multifamily housing market." (Doc. No. 530 ¶ 2). RealPage rolled out its first revenue management software, YieldStar, after acquiring it from Camden Property Trust in 2002. (Id. ¶ 209). From 2002 to early 2016, YieldStar operated as a rent advisory service. (Id. ¶ 212). In early 2016, RealPage transitioned YieldStar to become a "rent-setting software." (Id.). RealPage then acquired Lease Rent Options ("LRO") from Rainmaker Group in 2017. (Id. ¶ 26). It integrated LRO and YieldStar into a "unified platform." (Id. ¶ 221). In 2020, RealPage launched

AI Revenue Management ("AIRM"), a "combination of its legacy revenue management platforms [YieldStar and LRO] and a super-charged price optimization and revenue management tool." (Id. ¶ 221). Today, RealPage operates a full suite of revenue management services, which also includes RealPage Revenue Management ("RPRM") (collectively the "Revenue Management Solutions" or "RMS"). (Id. ¶ 2).

RealPage's clients include owners of residential properties ("Owners"), companies that serve as both owners and operators of residential properties ("Owner-Operators"), and property management companies ("Managers"). (Id. ¶ 3). These companies are horizontal competitors. (Id. ¶ 6). As of December 2020, RealPage "had over 31,700 clients, including owner operators and each of the 10 largest multifamily property management companies in the United States." (Id. ¶ 61 (internal quotations omitted)).

Multifamily Plaintiffs allege that RealPage and its clients have formed an illegal price-fixing cartel. (See id. ¶ 6). It begins when RealPage touts its ability to help clients obtain the optimal price for housing units regardless of other normal market forces. (Id. ¶ 4). RealPage's clients each separately contract with RealPage, paying RealPage periodic fees and, critically, providing RealPage their independent commercially sensitive pricing data. (Id. ¶¶ 5, 13). RealPage then applies its revenue management algorithm to this data pool of competitor information to "recommend" optimal rent prices for each of RealPage clients, which is then available for each RealPage client to apply to multifamily and student apartment units in each of the markets where those clients are located. (Id. ¶ 4). To be sure, not all RealPage clients utilize RealPage's entire RMS suite; for example, some use only LRO while others have used YieldStar, LRO, and AIRM. (See, e.g., id. ¶¶ 70, 85, 88, 124). But regardless of which services a client

2

subscribes to, by "no later than 2020, . . . all RealPage RMS were combined into a single unified database."  (Id. ¶ 222).

By using the RMS, RealPage's clients are able to "price their units according to their collective goal of securing revenue lifts by increasing rents without regard for the typical market forces that drive supply and demand in a competitive environment."  (Id. ¶ 11).  They do this by (1) collectively agreeing to price their rental units in accordance with RealPage's RMS pricing recommendations, (id. ¶¶ 11, 15); (2) controlling the supply of rental units by "allow[ing] a larger share of their units to remain vacant," (id. ¶ 31); and (3) staggering lease renewals to "minimize naturally occurring periods of oversupply," (id. ¶ 36).  This collective behavior, driven by RealPage's pricing recommendations, has resulted in "parallel pricing that cannot be explained by typical economic factors" among the Owners, Owner-Operators, and Managers who use RealPage's RMS.  (Id. ¶ 22).  Additionally, between March 2015 and March 2023, "increased usage of RealPage's RMS corresponds with increasing rents over th[e] same period."  (Id. ¶ 21).

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  In reviewing a motion to dismiss, the Court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff."  Courtright v. City of Battle Creek, 839 F.3d 513, 518 (6th Cir. 2016).  However, the Court will "disregard bare legal conclusions and naked assertions" and "afford[] the presumption of truth only to genuine factual allegations."  Dakota Girls, LLC v. Philadelphia Indem. Ins. Co., 17 F.4th 645, 648 (6th Cir. 2021) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2007)) (internal quotations omitted). Nor can the Court

3

"credit a threadbare recital of the elements of a cause of action ... supported by mere conclusory statements." Dakota Girls, 17 F.4th at 648 (citing Iqbal, 556 U.S. at 678)) (internal quotations omitted). "Ultimately, only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. (quoting Iqbal, 556 U.S. at 679)) (internal quotations omitted). To avoid dismissal under Rule 12(b)(6), a complaint must contain either direct or inferential allegations with respect to all material elements of each claim. Wittstock v. Mark A. Van Sile, Inc., 330 F.3d 899, 902 (6th Cir. 2003).

## ANALYSIS

The Property Management Defendants make two arguments for dismissal. First, the Multifamily Complaint does not plausibly allege that the PMDs directly participated in the conspiracy to use RMS and follow its rent recommendations. (See Doc. No. 584 at 4–8). Second, the Multifamily Complaint does not plausibly allege that any PMD can be liable as an agent of its owner or owners. (Id. at 8–11). Neither argument requires dismissal.

### 1. The Multifamily Complaint Plausibly Alleges that the PMDs Directly Participated in the Alleged Conspiracy.

The Property Management Defendants argue that the Multifamily Complaint "attempts to apply its generic and conclusory allegations as to all Defendants to the Property Management Defendants" and that these allegations "are inadequate . . . as to the Property Management Defendants given the specific allegation that they did not make the decision whether to use RealPage's [RMS] or to follow its recommendations." (Doc. No. 584 at 5). True, the Multifamily Complaint alleges that "the decision whether to use RealPage's RMS rested on the desires of the ownership group" (Doc. No. 530 ¶ 5), not the Managers or the specific PMDs. (See also id. ¶ 199 ("it is ultimately up to the Owner whether or not a multifamily rental property will price its units according to RealPage's RMS, and any property management company assigned, contracted with,

4

and/or hired to provide property management services to the Owners' buildings are acting as the Owner's agents")). But the Property Management Defendants' characterizations grossly understate the actual allegations of their involvement.

The Multifamily Complaint alleges that, during the conspiracy period, each Property Management Defendant annually "entered into a written contract, paid for, and [regularly] used" at least one RealPage RMS (which Plaintiffs name) to manage some or all of its multifamily rental units nationwide. (See e.g., Doc. No. 530 ¶ 72). The PMDs acted "knowing that doing so required it to share confidential competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, allow [the PMD] to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices." (Id.). The Multifamily Plaintiffs specifically named, for each PMD, the executive allegedly involved in implementing RealPage RMS (with the exception of FMC and ZRS). (Id. ¶¶ 72, 74, 83, 118, 121, 154, 163, 193, 276). The Multifamily Complaint, as the PMDs acknowledge in their brief, alleges that each PMD "would not have paid for RealPage's RMS pricing services unless: (1) doing so enabled it to set prices above a competitive level; and (2) it knew its competitors were, likewise, using RealPage RMS to set their rental prices in the submarkets in which it operated." (Doc. No. 530 ¶¶ 72, 75, 83, 119, 122, 155, 164, 193. See also Doc. No. 584 at 5 (directly quoting language from the Multifamily Complaint) (internal quotation marks and citation omitted)).

Additional allegations on the involvement of all PMDs buoy those just referenced. For instance, the Multifamily Complaint alleges (1) that "the acceptance process begins with the Community Manager, [a PMD employee] who is responsible for reviewing RealPage's daily pricing recommendations[,]" (Doc. No. 530 ¶ 527 n.149); (2) that individuals at the PMDs

5

"worked closely" with RealPage Pricing Advisors daily to receive training and guidance on RealPage's RMS and to remind them to "enter all required leasing information into the revenue management system daily[,]" (id. ¶ 237 n.140); (3) that senior ranking executives at the PMDs "interfaced quarterly" with RealPage Pricing Advisors, (id.); (4) that "executives from Managing Defendants' companies placed pressure on their leasing managers to implement RealPage prices," (id. ¶ 20); (5) that each PMD "use[s] RealPage's RMS with the explicit and common goal of increasing rents for all members of the cartel by using coordinated algorithmic pricing," (id. ¶ 293); and (6) that each PMD provided RealPage its proprietary commercial data knowing that RealPage would use that data to recommend rental prices to its competitors. (See, e.g., Doc. No. 530 ¶¶ 31, 287, 289). The Multifamily Complaint also contains at least one allegation specific to the PMD, Pinnacle:

> Witness 6 also stated that at least monthly, the [Pinnacle] property she worked at received communications from RealPage wherein RealPage advertised the fact that Pinnacle's competitors were using RealPage's RMS to price their multifamily rental units. Witness 6 explained that these communications contained detailed information concerning not only Pinnacle's properties, but also of its regional competitors' properties who were pricing according to RealPage's RMS.

(Doc. No. 530 ¶¶ 246).

Though the Property Management Defendants complain that the allegations in the Multifamily Complaint are "group pleadings", (Doc. No. 584 at 4), the two cases they marshal say otherwise. For instance, in Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield, the Sixth Circuit noted that generic pleadings "alleg[e] misconduct against defendants without specifics as to the role each played in the alleged conspiracy." 552 F.3d 430, 426 (6th Cir. 2008). It went on to apply Twombly's reasoning for why such pleadings are rejected, reciting:

> Apart from identifying a seven-year span in which the § 1 violations were supposed to have occurred (i.e., [b]eginning as early as February 6, 1996, and continuing to the present," . . .) the pleadings mention no specific time, place or person involved

in the alleged conspiracies . . . . The complaint here furnishes no clue as to which of the four [defendants] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place . . . . [A] defendant seeking to respond to Plaintiffs' conclusory allegations in the § 1 context would have little idea where to begin.

Id. (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 565 n.10 (2007). The second case that the PMDs cite, In re Travel Agent Com'n Antitrust Litigation, addresses "Plaintiffs['] attempt to implicate the[] defendants in the purposed conspiracy by relying on several vague allegations contained in the Amended Complaint that refer to 'defendants' or 'defendants' executives" without alleging which defendants supposedly agreed or when and where the illicit agreement took place. 583 F.3d 896, 905–906 (6th Cir. 2009). Critical to the Sixth Circuit's analysis was the complaint's complete failure to "specify how these defendants [we]re involved in the alleged conspiracy." Id. at 905.

Those two cases do not control here. The Multifamily Complaint is not so vague as to render them unnavigable for individual PMDs. Each Property Management Defendant can determine when and where it is alleged that it entered the alleged conspiracy merely by looking at its contract with RealPage, and all but two can identify from the Multifamily Complaint an employee central to the conspiracy's implementation. (See Doc. No. 530 ¶¶ 72, 74-75, 83, 119, 121-22, 154-55, 163-64, 193).[1] The above, read with the remainder of the 302-page Multifamily Complaint, renders the notion that the PMDs have "little idea" how to respond to these allegations unserious. See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 565 n.10 (2007).

---

[1] For example, the Multifamily Complaint alleges that "[a]t a minimum, Pinnacle's Director of Revenue Management, Connie Aldape, is involved in implementing RealPage's RMS within Pinnacle." (Doc. No. 530 ¶ 154). The Multifamily Complaint does not identify specific employees from ZRS or First Communities who participated in implementing RealPage's RMS. (See Doc. No. 530 ¶¶ 117-18, 192-93).

7

## 2. The Multifamily Complaint Plausibly Alleges that the PMDs Should Be Liable as Agents.

The Property Management Defendants also argue that the Multifamily Complaint "fails to allege that any [PMD] can be liable as an agent of its owners." (Doc. No. 584 at 9). According to the PMDs, "the [Multifamily Complaint]'s allegations boil down to asserting that the Property Management Defendants use RealPage's software under contract . . . . a far cry from plausibly alleging that each Property Management Defendant knew about the alleged conspiracy, much less intended to join it or materially contributed to it."

The parties agree that agency law "applies [here] with full force" and that an agent may be liable if that agent "(1) had knowledge of its principal's purpose to restrain trade; (2) intended to restrain trade itself rather than simply earn its usual and customary commission, and (3) contributed materially to the restraint of trade." (Doc. Nos. 584 at 8-9 (quoting In re Fresh & Process Potatoes Antitrust Litig., 834 F. Supp. 2d 1141, 1170 (D. Idaho 2011)) (internal quotations omitted). See also Doc. No. 613 at 9-10). They correctly state agency law as it applies to antitrust claims in the Sixth Circuit: "[A] corporation's officers and agents may be held individually liable for corporate actions that violate the antitrust laws if they authorize or participate in the unlawful acts." Brown v. Donco Enterprises, Inc., 783 F.2d 644, 646 (6th Cir. 1986).

Based on the allegations already discussed, Defendants' argument is unpersuasive. The Multifamily Complaint has plausibly alleged each of these requirements. Plaintiffs satisfy the first element by alleging that each PMD entered into a contract with RealPage "knowing that doing so required it to share confidential competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, allow [the PMD] to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices." (See, e.g., Doc. No. 530 ¶¶ 72, 75). They satisfy the second

8

element by alleging that the PMDs "use RealPage's RMS with the explicit and common goal of increasing rents for all members of the cartel by using coordinated algorithmic pricing."[2]  (Id. ¶ 293).  Finally, they satisfy the third element by alleging that each PMD provided RealPage its proprietary commercial data knowing that RealPage for the mutual benefits of their alleged co-conspirators.  (See, e.g., Doc. No. 530 ¶¶ 287, 289).  The PMDs' motion cannot succeed in the face of these allegations.

An appropriate order will be entered.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

---

[2] The Property Management Defendants' reliance on Marion Diagnostic Center, LLC v. Becton Dickinson & Co., 29 F.4th 337 (7th Cir. 2022), to argue that allegations of sufficient financial incentive are necessary to establish an agent's intent to restrain trade is misplaced.  In Marion Diagnostic Center, LLC, the Seventh Circuit distinguishes financial incentives like commissions, bonuses, gifts, vacations, and other perks from an "intent to restrain trade."  (See id. at 350 ("We are skeptical that these incentives constitute sufficient circumstantial evidence of a conspiracy, particularly because the incentives are directed to frontline sales representatives.")).

9