**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II)** | ) ) ) ) ) ) ) ) ) ) ) | **Case No. 3:23-md-3071**<br>**MDL No. 3071**<br><br>**JURY DEMAND**<br><br>**Judge Waverly D. Crenshaw, Jr.**<br><br>**This Document Relates to:**<br>**ALL CASES** |

# PLAINTIFFS' RESPONSE IN OPPOSITION TO THE MOTION OF STATE ATTORNEYS GENERAL TO INTERVENE AND PROPOSED OBJECTIONS

## I. INTRODUCTION

This Court has twice held already that the Settlement Agreements and related preliminary approval Orders in this litigation do not impair the sovereign claims of any state. It is undisputed that such claims, including civil penalties and injunctive relief, are excluded from the settlements. Dkt. 1498 at 3 n.1; 1499 at 1. Nevertheless, the Attorneys General of the District of Columbia, Kentucky, Maryland, New Jersey, and Washington (the "State AGs") conflate their *parens patriae* damages claims with their sovereign enforcement powers to once again ask this Court to upend 37 arm's-length Settlements to preserve their ability to seek the same damages provided by the Settlements.

Consistent with applicable precedent,[1] this Court in its July 16, 2026 Order already ruled that the interest a State AG asserts when seeking damages "on behalf of" residents is the residents' interest, not the State's sovereign interest (Dkt. 1463 at 2); and that interest is already adequately represented by Settlement Class Counsel. The Court observed that to hold otherwise would not only permit duplicate recovery for those Settlement Class Members who are also constituents of the State AGs, but also would upend any motivation for defendants to settle any class claims in the future. *Id.* The central tenet of the State AGs' current Motion to Intervene rests on the same legal fallacy—that their *parens patriae* claims are a sovereign or quasi-sovereign interest, and that any release by Settlement Class Members infringes on their enforcement authority. But the Court's prior decisions (which are in line with a long string of precedent rejecting the same arguments)

[1] *See In re Am. Invs. Life Ins. Co. Annuity Mktg. & Sales Pracs. Litig.*, 2013 WL 3463503, at *8 (E.D. Pa. July 10, 2013); *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592 (1982) ("*Snapp*"); *Chapman v. Tristar Prods., Inc.*, 940 F.3d 299, 305-06 (6th Cir. 2019); *In re Generic Pharms. Pricing Antitrust Litig.*, 2025 WL 2777570 (E.D. Pa. Sept. 26, 2025).

remain correct. Nothing in the State AGs' renewed motion or proposed objections could lead the Court to any other conclusion.

Putting the weight of legal authority against the State AGs' position to the side, the practical reality of what they request is staggering. Under the State AGs' proposed analysis, any state could veto a nationwide private antitrust class settlement simply by filing a follow-on *parens patriae* action seeking the same relief for the same people.[2] Settlement Class members would have to wait for those actions, and any appeals, to be complete before any settlements could be reached. And without any Rule 23 class objection, opt out, or distribution process for state AG settlements, there would be no protections or guarantees that Settlement Class Members would receive a dollar from any state enforcement actions. Without their consent, these Settlement Class Members would be deprived of control over their own claims, stripped of any ability to obtain and benefit from a private settlement after weighing the risks and benefits, placed at risk of having an AG lose the case with *res judicata* effects, and (even in a best-case-scenario) left with no guarantee that they would actually see a single dollar from any recovery that the AG makes on their behalf. This would violate basic notions of due process. It cannot be the law, and it is not the law. It would render the entire framework of class action antitrust settlements obsolete and would give State AGs an effective heckler's veto over private enforcement—a power no court has recognized and that Congress did not grant when it authorized *parens patriae* antitrust enforcement. The State AGs do not cite a single case that endorses this result.

---

[2] *See e.g.*, *In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*, 770 F.2d 328, 336-37 (2d Cir. 1985) (holding that injunction would have been appropriate to protect finality of class action settlement, as post-settlement injunction barring re-litigation of released claims is proper exercise of court's authority, and finality of class action settlements could otherwise be defeated by subsequent suits asserting rights derivative of those released by class members).

Accordingly, Plaintiffs urge the Court to deny the State AGs' Motion to Intervene, treat their "Objections" as an *amicus curiae* brief or statement of interest, and reject their arguments.

## II. ARGUMENT

### A. Intervention is Unwarranted.

#### 1. The State AGs Lack Article III Standing to Intervene.

The State AGs first argue that they have Article III standing to intervene. Article III standing requires a showing of (1) "injury in fact," "an invasion of a legally protected interest" that is "concrete and particularized," and "actual or imminent, not conjectural or hypothetical;" (2) "a causal connection between the injury and the conduct complained of;" and (3) a likelihood, "as opposed to mere[ ] speculat[ion], that the injury will be redressed by a favorable decision."[3]

The State AGs are not members of the Class; every one of the settlements explicitly exclude the States from the Class definition. The State AGs' sovereign enforcement claims, civil penalties, and injunctive relief are not in dispute. The States are free to pursue those. Going further, the Class releases that the State AGs challenge explicitly carve out any sovereign claims. This makes sense; Settlement Class Members cannot release claims that they do not own.

On this most basic premise, the State AGs lack Article III standing because they are not Settlement Class Members. Following similar attempts by Gulf State AGs to intervene to challenge the scope of a private class settlement, the district court in *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex., on April 20, 2010*, 910 F. Supp. 2d 891, 943 (E.D. La. 2012) ("*Deepwater Horizon*") held that "[t]he Gulf States, which are obviously not members of the settlement class, lack standing to submit objections."[4] Here, the Article III standing that the State AGs claim is—

---

[3] *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-561 (1992) (internal citations omitted).
[4] *See also Fidel v. Farley*, 534 F.3d 508, 515 n.5 (6th Cir. 2008) (concluding that the court lacked jurisdiction to consider objections to class action settlement brought by non-class member); *cf. Tenn. Ass'n of Health Maint. Orgs., Inc. v. Grier*, 262 F.3d 559, 566 (6th Cir. 2001) (finding non-

by the State AGs own admission (Dkt. 1498 ("Br.") at 9)—based on their *parens patriae* authority. That authority is entirely derivative of Settlement Class Members' claims. Accordingly, the State AGs' lack of any concrete interest is fatal to their Article III standing argument, which fails on other grounds as well.[5]

**a. Nominal Interest Does Not Confer Standing.**

In *Snapp*, the Supreme Court, in addressing a state's *parens patriae* claims, distinguished between a nominal interest (which would not confer standing) and a quasi-sovereign or sovereign interest (which would). The Court held that, to maintain a *parens patriae* action, "[t]he State must articulate an interest apart from the interests of particular private parties." 458 U.S. at 607. Moreover, "[i]nterests of private parties are obviously not in themselves sovereign interests, and they do not become such simply by virtue of the State's aiding in their achievement. In such situations, the State is no more than a nominal party," *id.* at 602, and as such, it has not sustained an injury in fact necessary to confer standing.

Courts interpreting this guidance and looking at an analogous set of facts have repeatedly rejected the State AGs' argument—declining to find injury in fact and rejecting intervention—where *parens patriae* claims were at issue. For example, in *Chapman*, the Sixth Circuit rejected the state of Arizona's efforts to upend a settlement on similar grounds, finding that where "the only injury alleged is injury to an identifiable group of Arizonans (class members in the instant litigation)," making the state a nominal party only.[6] Similarly, in *In re Generic Pharms. Pricing Antitrust Litig.*, a group of state AGs argued that a class settlement would interfere with its

---

class members lacked standing to object to claimed noncompliance with Rule 23(e)'s notice provisions).

[5] *Chapman*, 940 F.3d at 306 (holding the state lacked *parens patriae* standing where only injury alleged was to an identifiable group of individual residents and state articulated no quasi-sovereign interest distinct from those of the private class members).

[6] 940 F.3d at 306.

prosecution of claims in another forum and sought to intervene on that basis. The court denied the motion, finding that "the Movant States have only a nominal interest here that is insufficient to confer standing to intervene . . . ." No. 16-md-02724 slip op., (E.D. Pa.), Dkt. 3600 at 5 (Attachment A hereto) ("*Generics*").

The State AGs' attempt to recast their *parens patriae* claims as sovereign or quasi-sovereign in nature to avoid a similar finding here. They argue that the proposed releases "would directly interfere with pending claims and the exercise of sovereign and/or quasi-sovereign enforcement authority." Br. at 11. This circular logic—essentially, that *parens patriae* claims are sovereign or quasi-sovereign simply by virtue of being brought by the State AGs—ignores the very distinction drawn in *Snapp* and *Chapman*.

In support of their argument, the State AGs cite to numerous cases for the basic proposition that depriving a third party of a legal claim causes legal prejudice sufficient to confer Article III standing. Br. at 15-16. But that assumes that the State AGs have a valid legal interest that is being taken away in the first place. That question requires the analysis *Snapp* prescribes and *Chapman* applied: is the State asserting an interest that is genuinely sovereign, or is it "no more than a nominal party" asserting interests that belong to the individuals it represents?[7] On the one hand, civil penalties and state-law public-injunctive relief are unambiguously sovereign. No private plaintiff could have obtained a civil penalty in this MDL, and no private plaintiff holds the state-law enforcement authority that gives the State AGs their injunctive powers. Those remedies were never part of this MDL, could not have been released by Settlement Class Members who never

---

[7] 458 U.S. at 602.

possessed them, and are expressly carved out of the settlement agreements. This Court confirmed that carveout in its July 16, 2026 Order. Dkt. 1463 at 2. There is no dispute about any of this.

*Parens patriae* monetary relief is different. When the State AGs seek monetary compensation for renters who paid artificially inflated rents, they are seeking the same remedy—measured by the same overcharge, for the same period, in the same markets—that the class action is designed to provide. The renters whose overcharges the State AGs seek to recover are, in every material respect, the renters who are members of the proposed Settlement Class. Here, as in *Chapman* and *Generics*, the State AGs are only nominal parties and lack a concrete interest, separate from that of Settlement Class Members, that confers Article III standing.

Failing on this point, the State AGs try to avail themselves of some of *Snapp* and *Chapman*'s exceptions in search of a protectable interest. They assert that Settlement Class Members' release of damages claims implicate the States' "quasi-sovereign interest in the economic 'health and well-being' of their residents." Br. at 16. However, in *Chapman*, the Sixth Circuit rejected that same argument where "the only injury alleged is injury to . . . class members in the instant litigation," and the state "ha[d] not fleshed out the indirect effects of this alleged injury on Arizona as a whole." 940 F.3d at 306.

The State AGs also argue that the States have exercised lawmaking authority intending to address the issues arising in this litigation, pointing to each State's general antitrust statutes. Br. at 12. It would be a novel theory to suggest that any antitrust claim represents a sovereign or quasi-sovereign claim simply because a state has an antitrust statute. The State AGs cite no authority to support that sweeping proposition. To the contrary, similar arguments have been rejected in other contexts. For example, in *Paterson v. Texas*, 308 F.3d 448, 450-51 (5th Cir. 2002), the Fifth Circuit found that the Texas Attorney General had no standing to appeal final approval despite the AGs'

statutory authority to enforce Texas Property Code on behalf of "the interests of Texas class members." Similarly, *In re Am. Int'l Grp., Inc. Sec. Litig.*, 916 F. Supp. 2d 454, 464 (S.D.N.Y. 2013) ("*AIG*"), a district court held that New York Attorney General did not have standing to intervene to object to settlement even though the AG was authorized to enforce the Martin Act (a New York's securities law) "on behalf of New Yorkers" to "maintain the integrity of the marketplace and protect the public from securities."

**b. Likelihood of Redress**

The only real interest that the State AGs have expressed on behalf of their residents is in securing more money. Courts have held that this professed interest does not constitute an interest on behalf of a State's general population, as opposed to a subset of individual residents, that would give rise to standing to intervene. The district court in *Chapman* explained this well when it held that a State AGs' purported *parens patriae* interest stemming from "unfair release of Arizonan class members' claims" in exchange for a settlement of "questionable value" did not give Arizona AG standing to intervene; injury was to "an identifiable group of individual residents" and "cannot serve as a basis for parens patriae standing."[8]

Lack of a protectable interest alone is fatal to the State AGs claim of standing. But they also fail to show that allowing them to intervene would redress their interest in getting more money for their citizens. So far, the State AGs have entered into five settlements with the Overlap Defendants, totaling $2,765,000. Not a single settlement reached by the State AGs earmarks *any* money at all to their citizens. And the State AGs' claim that their injuries can be redressed by

8 *Chapman v. Tristar Prods., Inc.*, 2018 WL 4203533, at *3 n.22, *4 (N.D. Ohio Sept. 4, 2018); *see also Deepwater Horizon,* 910 F. Supp. 2d at 943 ("The Gulf States may not invoke the parens patriae doctrine, as any challenge to the Settlement Agreement simply represents an effort to advance the particular financial interests of a subset of these states' citizens. . . . Interests of private parties are obviously not in themselves sovereign interests, and they do not become such simply by virtue of the State's aiding in their achievement.") (quoting *Snapp*, 458 U.S. at 602).

rejecting or rewriting the Settlements is pure conjecture, based on the State AGs' belief that they can get more money than private plaintiffs can. In reality, many state enforcement actions (brought by the State AGs here and otherwise) have resulted in small or non-existent monetary payments, including Kentucky's $115,000 settlement with Greystar (with injunctive relief virtually identical to the injunctive relief here) and $50,000 settlement with First Communities Management[9] and Nevada's settlement with RealPage for a $200,000 charitable contribution.[10] Thus, the State AGs fail to show that there is a likelihood, as opposed to mere speculation, that they would be able to achieve a better result for individual Class Members absent the challenged Settlements.

**2. Intervention Under Rule 24(a)(2) Is Not Warranted.**

Rule 24(a) provides a right to intervene to non-parties where they claim an interest in the subject of the action and "disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." As discussed above and in Plaintiffs' prior briefing (Dkt. 1294, 1430), the State AGs have no more than a nominal interest here, and so they fail to satisfy the standard for intervention as a matter of right.

The State AGs argue that they have a "substantial legal interest" in preserving their enforcement rights. In support, they cite to authority where statutory or contractual rights were implicated in a way that is absent from this case, such as where the settlement threatened to

---

[9] Consent Judgment and Dismissal Re Greystar and Consent Judgment and Dismissal Re First Communities Management, Inc., *Coleman v. RealPage, Inc., et al.*, No. 2:25-cv-00093, Dkt. 153-54 (E.D. Ky. July 27, 2026).

[10] Press Release, Nevada Attorney General Aaron D. Ford, *Attorney General Ford Secures Relief for Tenants, Reaches Settlement in Lawsuit with Property Management Software Company RealPage*, Sept. 19, 2025, *available at* https://ag.nv.gov/News/PR/2025/Attorney_General_Ford_Secures_Relief_for_Tenants,_Reaches_Settlement_in_Lawsuit_with_Property_Management_Software_Company_RealPage/.

retroactively impair contracts involving a third party or where the intervenors were parties to an underlying consent decree.[11] Those types of circumstances are not present here.

The AGs also continue to conflate their sovereign claims with representative *parens patriae* claims that are owned by Settlement Class Members. They do this by characterizing as "an enforcement claim" or "statutory claim" any claim premised on federal or state statute that authorizes an AG to bring representative *parens patriae* claims that duplicates an individual renter's claim. *See, e.g.*, Br. at 15 (describing their purported interests as "existing *statutory claims* and *enforcement rights* whose current, pending exercise the Proposed Settlements threaten to impair") (emphases added). That is not a valid way to approach the issue presented. Ultimately, it is the substantive distinction between the claims that is critical here, not linguistics about what it means to "enforce" a law. Nothing in the Settlements impairs State AGs from bringing claims that *only* the AGs own, including claims seeking civil penalties or injunctive relief as authorized by statute. That is different from barring the State AGs from continuing to pursue representative compensatory damages claims brought in a *parens patriae* capacity. Under *Snapp* and *Chapman*, those claims belong to the underlying class members and are theirs to control.

Finally, the AGs invoke the final clause of Rule 24(a)(2), under which intervention by right is required where a person claims an interest that would as a practical matter be impaired or impeded by disposing of the action, "unless existing parties adequately represent that interest." The State AGs turn this requirement on its head. The State AGs are not Settlement Class Members and their sovereign claims are unaffected by the releases in the Settlements. Their purported

---

[11] *See, e.g., Linton by Arnold v. Comm'r of Health & Env't, State of Tenn.*, 973 F.2d 1311, 1319 (6th Cir. 1992) (significantly protectable interest found in the settlement's "impairment of the movants' *contractual and statutory* rights to discontinue their voluntary participation in the Medicaid program") (emphasis added); *Jansen v. City of Cincinnati*, 904 F.2d 336, 342 (6th Cir. 1990) (intervenors were parties to consent decree challenged in action).

interest is—and can only be—compensatory damages for Settlement Class Members who reside in their jurisdictions. That is the only claim released by the Settlements that the State AGs challenge, no matter how else they characterize their interests throughout their brief. It makes no sense that Settlement Class Members (and the Court-appointed Settlement Class Counsel who represent them) do not adequately represent the interests of Settlement Class Members. The Settlements have undergone a Rule 23 notice and objection process, with over 7 million potential Settlement Class Members receiving direct notice. As set out more fully in Plaintiffs' contemporaneously filed final approval papers, the response from the proposed Settlement Class has been overwhelmingly positive: just 1,456 opt-out forms received (with nearly 95% represented by the same attorney) and only three objections to the overall settlement amount.

The State AGs also argue that "MDL Plaintiffs negotiated and now seek approval of settlements that purport to release State claims and remedies and sought injunctions that may restrain their pursuit . . . . ." Br. at 18. But the Settlements release no State claims, nor could they. All state governmental entities are excluded from the Settlement Class. Plaintiffs agree with the State AGs "that private class members cannot release sovereign claims," and the Settlements do no such thing. The State AGs argument on this point fails as well.

**3. Permissive Intervention Under Rule 24(b) Is Not Warranted.**

Next, the State AGs argue for permissive intervention under Rule 24(b)(2) or 24(b)(1). Rule 24(b)(2) allows for intervention by a government officer or agency where any party's claim or defense is based on "a statute or executive order administered by the officer or agency . . . ." Pointing to various statutes and asserting that the Settlements implicate such regimes and remedies, the State AGs argue that "Rule 24(b)(2) exists to permit governmental officers to participate in precisely these circumstances." Br. at 22. But none of the Settlements attempt to, or could, release any claim based on any State AGs' statutory authority, contrary to what the State AGs say

throughout their brief. *E.g., id.* at 6. The State AGs' repackaging of their previous arguments to lump together compensatory *parens patriae* claims with sovereign statutory claims fails here, too.

With respect to 24(b)(1), this Court has discretion to grant permissive intervention to anyone who "has a claim or defense that shares with the main action a common question of law or fact." But "[p]ermissive intervention under Rule 24(b) is not a mechanism for evading the requirements of legal standing."[12] Courts within this circuit have denied permissive intervention where the movant did not have standing, as the State AGs do not have here.[13]

Further, Rule 24(b)(3) cautions against granting permissive intervention, either under 24(b)(1) or (b)(3), where the intervention "will unduly delay or prejudice the adjudication of the original parties' rights." "Permissive intervention that adds little value to the proceedings and only serves to cause undue delay to original parties is considered to be unwarranted."[14]

That is the case here, where the State AGs have already appealed the Court's preliminary approval order and seem to be teeing up an appeal if final approval is granted. This would unnecessarily delay administration of the proposed settlements (should they be finally approved)

---

[12] *In re Vitamins Antitrust Litig*., 2000 WL 1737867, at *6 (D.D.C. Mar. 31, 2000).

[13] *Supra* § II(A)(1); *T&R Props., Inc. v. Berlin Twp.*, 2025 WL 1682227, at *7 (S.D. Ohio June 16, 2025) (movant's lack of a legal interest in this dispute counsels against permitting it to intervene); *Nemes v. Bensinger*, 336 F.R.D. 132, 139 (W.D. Ky. 2020) (considering uncertainty of proposed intervenor's standing in denying permissive intervention); *United States v. Mich. Dep't of Cmty. Health*, 2011 WL 2412602, at *9 (W.D. Mich. June 9, 2011) (considering the proposed intervenor's lack of standing in denying permissive intervention).

[14] *Aetna Inc. v. Insys Therapeutics, Inc.*, 330 F.R.D. 427, 434 (E.D. Pa. 2019) (denying permissive intervention where it "may have the resultant effect of prejudicing the original parties' rights from litigating and ultimately resolving this case"); *see also In re Auto. Parts Antitrust Litig.*, 2020 WL 6737545, at *4 (E.D. Mich. Nov. 17, 2020), *aff'd sub nom. In re Auto. Parts Antitrust Litig., End-Payor Actions*, 33 F.4th 894 (6th Cir. 2022) ("[T]he prejudice to the original parties is clear: intervention would delay the distribution of settlement proceeds."); *O'Bryant v. ABC Phones of N. Carolina, Inc.*, 2020 WL 7634780, at *10 (W.D. Tenn. Dec. 22, 2020) ("Allowing intervention at this stage for the purpose of opposing the settlement would delay the outcome of the litigation. Intervention for the purpose of disrupting the settlement is prejudicial to the parties.").

and increase the cost of administering the settlements, as Settlement Class Members (who are by their nature renters) are likely to move while appeals are ongoing. This prejudice is reason to deny permissive intervention.[15]

### B. Because They Lack Standing to Intervene, the State AGs' Arguments Should be Construed as an *Amicus Brief or Statement of Interest.*

The appropriate vehicle for the State AGs' concerns is an *amicus* brief or statement of interest. That is how courts considering this question repeatedly have treated governmental objections to class settlements when the AGs lack standing.[16] Indeed, consistent with that approach, that is what the State AGs initially did here in connection with preliminary approval (Dkt. 1281), and the State AGs cite no counterexamples.

### C. The State AGs' Four Specific Objections Fail on the Merits.

The State AGs' purported objections (Dkt. 1499, "Obj.") fail on many of the same bases as their request to intervene fails—they have no interest, separate and apart from Class Members, in the releases contained in the Settlements. Settlement Class Members may properly release their

---

[15] *Bowling v. Pfizer Inc.,* 159 F.R.D. 492, 496 (S.D. Ohio 1994) ("[T]he most compelling reason to deny the PCO the opportunity to intervene is to immediately begin the implementation of the settlement"); *In re Vitamins Antitrust Litig*., 1999 WL 1335318, at *4 (D.D.C. Nov. 23, 1999) ("[G]ranting these motions to intervene could unduly prejudice the settling parties by unnecessarily delaying their settlement.").

[16] *See, e.g.*, *In re Generic Pharms. Pricing Antitrust Litig.*, 2025 WL 2777570, at *2 (E.D. Pa. Sept. 26, 2025) ("Although they are not part of the class, a number of states, through their attorneys general, have raised objections to the settlement. The Court denied their motion to intervene but heard argument at the Fairness Hearing from them as *amici curiae*[.]"); *In re Rio Hair Naturalizer Prods. Liab. Litig.*, 1996 WL 780512, at *1 (E.D. Mich. Dec. 20, 1996) ("[The court heard] objections and arguments of the California Attorney General who had been granted leave to appear in this matter as amicus curiae[.]"); *In re Am. Int'l Grp., Inc. Sec. Litig.*, 916 F. Supp. 2d 454, 462 n.4 (S.D.N.Y. 2013) (quoting *In re Currency Conversion Fee Antitrust Litigation*, 263 F.R.D. 110, 125 (S.D.N.Y. 2009)) ("In the antitrust context, a court has held because it is not a member of the class and lacks standing to object, the Government submits 'comments' on the Settlement.") (citation modified).

own claims, including through participation in a class action, as the claims belong to them rather than the government.[17] This is the case whether the relief sought is equitable or damages.[18]

### 1. Objection A: The Releases Do Not Extinguish the State AGs' Sovereign Claims—a Point This Court Has Already Established—and Any Advisory Opinion on the State AGs' Pending Litigation Would Be Inappropriate.

The State AGs seek an order providing that no settlement provision shall be construed to affect their enforcement claims. Obj. at 14. The Court has already held that the settlements preserve their sovereign enforcement authority. Dkt. 1463 at 2-3. The objection is therefore moot with respect to civil penalties and state-law injunctive relief.

With respect to *parens patriae* damages and disgorgement, the objection again assumes the distinction it needs to establish. The State AGs argue that "[c]lass members 'do not possess the State's *parens patriae* powers,'" making it "axiomatic that they cannot release such claims." Obj. at 5 (citing *Zepeda v. PayPal, Inc.*, 2017 WL 1113293, at *17 (N.D. Cal. Mar. 24, 2017)). That is

---

[17] *In re Am. Invs. Life Ins. Co. Annuity Mktg. & Sales Pracs. Litig.*, 2013 WL 3463503, at *8 (E.D. Pa. July 10, 2013).

[18] *See Cal. v. IntelliGender, LLC*, 771 F.3d 1169, 1179-80 (9th Cir. 2014) (holding California's restitution claims were seeking the same individual compensatory relief previously pursued by settlement class members); *In re Generic Pharms. Pricing Antitrust Litig.*, 2025 WL 2777570, at *5 (granting final approval over the objection that the settlement released *parens patriae* and disgorgement claims, where the objecting States "have not shown that their *parens patriae* authority . . . supplants the ability of consumers to pursue actions for damages"); *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, Case No. 2:10-md-02179-CJB-DPC, Dkt. 6276-1 at 72 (E.D. La. Apr. 18, 2012) (approving settlement where class release reached claims asserted "directly, indirectly, derivatively, representatively or in any other capacity"); *In re Am. Invs. Life Ins. Co.*, 2013 WL 3463503, at *9 (approving settlement where release included representative claims including equitable relief); *Esslinger v. HSBC Bank Nev., N.A.*, 2012 WL 5866074, at *7 n.2 (E.D. Pa. Nov. 20, 2012) (same). *Connecticut v. Sandoz, Inc.*, 820 F. Supp. 3d 125 (D. Conn. 2026), upon which the State AGs rely, does not apply. Even if disgorgement might in some instances warrant a different analysis than other equitable remedies, as discussed below, the State AGs never explain why their disgorgement claims in this context are not simply compensatory damages repackaged as equitable relief. *See Liu v. S.E.C.*, 591 U.S. 71, 88-90 (2020).

true as to civil penalties and public injunctions, which class members genuinely cannot release because they do not hold them. But the class members here are the same renters for whose benefit the State AGs seek monetary damages. Whether those class members can, through their settlement representatives, release their own compensatory claims for overcharged rent—claims that the State AGs are simultaneously pursuing in a representative capacity—is a different question.[19]

Indeed, the State AGs' own cited case makes this point. In *Zepeda v. PayPal*, a class member objected to the settlement, which defined "Released Claims" to include claims "that have been or could be asserted in any individual, class, private attorney general, representative, parens patriae or any other capacity . . . ." 2017 WL 1113293, at *17 n.18 (citation modified). Overruling the objection and granting final approval, the court noted that "the Settlement does not require the State to release any parens patriae claims"—rather, "the Settlement only specifies that *class members* release their individual claims, which includes their right to recover in a subsequent parens patriae action if one is brought by the State." *Id.* (emphasis added). The other cases that the State AGs cite address governmental enforcement authority, not representative monetary claims that are substantively identical to class members' claims.

The State AGs also argue that because their enforcement claims cannot be transferred to this MDL under 28 U.S.C. §1407(g), their claims cannot be released here. However, this jurisdictional argument misses the point. The releases do not purport to adjudicate or transfer the State AGs' claims. Instead, they operate on class members' own compensatory claims, which are squarely within this Court's jurisdiction. The question whether that release then operates as a

[19] The cases that the State AGs cite address governmental enforcement authority, not representative monetary claims that are substantively identical to class members' claims. *See E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) (addressing agency's statutory enforcement authority); *U.S. Commodity Futures Trading Comm'n v. Kratville*, 796 F.3d 873, 889 (8th Cir. 2015) (same).

defense in State enforcement proceedings is one that the State courts can answer and is not properly in front of this Court.

The State AGs highlight disgorgement as an example of why the Settlements are improper, but their example illustrates why the relief they seek is not necessary or appropriate. As the State AGs point out, the Sixth Circuit has held that an "equitable disgorgement award seeks to deprive the wrongdoer of his ill-gotten profits." *Osborn v. Griffin*, 865 F.3d 417, 452 (6th Cir. 2017). The State AGs also cite to *Sandoz*, which held that private settlements did not foreclose States' disgorgement claims, subject to appropriate credits. MDL Plaintiffs do not dispute that holding. However, the disgorgement claim the State AGs seek to pursue has to be different in kind and substance from the damages claim, *i.e.*, the overpayment in rent. The State AGs have failed to identify such a difference in their papers. The State AGs, at least as to the disgorgement claim as identified, are "essentially seeking a double recovery" from what the MDL class has already pursued and settled here. *See Intelligender*, 771 F.3d at 1180; *see also Zepeda*, 2017 WL 1113293, at *17 n.18. The State AGs have provided no authority for pursuing such an overlapping claim. As this Court has already noted, the State AGs cannot seek duplicative damages for the Settlement Class Members that will be compensated from the multimillion dollar class settlement fund. Dkt. 1463 at 2-3.

But perhaps more importantly, the Court need not make any advisory opinion or declaratory statement on the scope of the releases in this case; whatever equitable disgorgement award is retained by the State AGs will be litigated at the appropriate time in the forums in which their cases are actually pending, as they were in *Sandoz*.

To the extent that the State AGs argue that the bargained-for releases in the Settlement are improper, that argument is without merit. Plaintiffs can release the claims that they own, and they cannot release claims that the States own. The Settlements call for nothing different.

**2. Objection B: The Settlements Are Fair and Reasonable Under Rule 23(a).**

The State AGs invoke Rule 23(a)'s requirement that the Court determine whether the Settlements are "fair, reasonable, and adequate" and instruct the Court to "meaningfully assess the settlement's consideration against the claims being compromised." Obj. at 14. Plaintiffs' Motion for Final Approval conducts this analysis in full detail. Plaintiffs respond here to two specific arguments the State AGs make.

**a. Objections B-1 and B-3: The Monetary Relief Is Adequate Under Controlling Standards.**

The State AGs argue that the $359 million in settlement recovery achieved is inadequate, based on their back-of-the-envelope math. As discussed in Plaintiffs' Motion for Final Approval, the Settlements achieve approximately 5% of best-case, single damages that could be brought against the Settling Defendants. Courts have consistently approved settlements in a similar range.[20] Unlike the amounts that the State AGs claim they will get, these Settlements are not prospective

---

[20] *See, e.g., In re N.J. Tax Sales Certificates Antitrust Litig.*, 2016 WL 5844319, at *9 (D.N.J. Oct. 3, 2016) (approving settlement of approximately 2.5% of the "best possible recovery"); *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 330 F.R.D. 11, 48 (E.D.N.Y. 2019) (noting approval of recovery of 2.5% of the largest estimate of actual damages); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 483 (S.D.N.Y. 2009) (approving settlement of 2% of "aggregate expected recovery"); *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 4 F. Supp. 3d 94, 103-04 (D.D.C. 2013) (approving settlement of 4- 8% of "'best case scenario' potential recovery"); *Medoff v. CVS Caremark Corp.*, 2016 WL 632238, at *6 (D.R.I. Feb. 17, 2016) (approving settlement of 5.33% of "maximum amount of recoverable damages"); *see also Columbus Drywall & Insulation, Inc. v. Masco Corp.*, 2008 WL 11319971, at *4 (N.D. Ga. Mar. 4, 2008) ("Other federal courts have approved class action settlements in antitrust cases and other complex actions representing a small percentage of the potential recovery if plaintiffs had succeeded fully at trial.").

or hypothetical—they are real and ready to be distributed upon completion of the claims process. Plaintiffs also retain joint and several liability, and the ability to recover more, against the remaining non-settling Defendants, which includes RealPage – the party responsible for developing and licensing the very products that facilitated the alleged conspiracy.

The State AGs' reliance on *Shane Group, Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299 (6th Cir. 2016), is misplaced. *Shane Group* reversed final approval not because the amount was inadequate, but rather because all of the relevant documents were sealed, including the expert report "whose valuation of the class's claims by all accounts was the keystone of the settlement agreement." *Id.* at 306. In contrast, all of the Settlements were reached here before any expert reports were completed. The State AGs cite no authority that requires class plaintiffs to wait until class certification to reach a settlement, and Courts frequently approve settlements before a final damages estimate is available. Moreover, here the $359.925 million total has been evaluated by experienced, mediator-supervised counsel against an individualized assessment of each Settling Defendant's actual exposure. No class member has objected that they need more information to evaluate the Settlements, and the State AGs' arguments to the contrary should be rejected.

The State AGs also argue that "given the substantial gap between the potential damages . . . and the $359.925 million gross settlement fund, the identified risks must be substantial enough to justify that particular discount." Obj. at 19.[21] As noted above, there is no "extraordinary discount" (*id.*) here; the Settlements are substantial, material, and well within the ranges approved

[21] The State AGs proffer a stylized treble damages estimate of over $20 billion based on several assumptions. To be clear, Plaintiffs do not endorse this methodology, or damages estimate as the proper estimate of damages recoverable in this litigation or the proper benchmark by which to evaluate partial class action settlements.

by Courts.[22] The State AGs conclude that certification risk inherent in class cases—which State AGs do not face—"cannot justify using that settlement to extinguish a separate public-enforcement mechanism that does not face those same risks" (*id.* at 20). Plaintiffs agree as to the States' sovereign claims.[23] However, Settlement Class Members are, of course, free to release their own claims via a class-action mechanism – and explained elsewhere in this brief, the Settlements appropriately release Settlement Class Members' claims for monetary relief.

**b. Objection B-2: The Class Notice Was Adequate.**

The State AGs argue that the notice was deficient for failing to disclose aggregate damages estimates and for failing to warn class members that remaining in the class might impair their ability to benefit from State enforcement. Neither argument supports denial of final approval.

Rule 23(e)(1) requires that notice be directed "in a reasonable manner to all class members who would be bound by the proposal." As the Sixth Circuit explained in *Gooch v. Life Inv. Ins. Co. of Am.*, 672 F.3d 402, 423 (6th Cir. 2012) (citation omitted), "[d]ue process 'does not require the notice to set forth every ground on which class members might object to the settlement.'" All that notice must do is "'fairly apprise ... prospective members of the class of the terms of the proposed settlement' so that class members may come to their own conclusions about whether the settlement serves their interests." *Id.* As discussed in Plaintiffs' Motion for Final Approval, Plaintiffs easily satisfy that standard, including through dissemination of Court-approved long-

---

[22] *See In re Am. Int'l Grp., Inc. Sec. Litig.*, 916 F. Supp. 2d 454, 468 (S.D.N.Y. 2013) (rejecting New York AGs' argument that the settlement undervalued the claims as being "based on sheer speculation").

[23] The D.C. AG recently reached a separate settlement with Mid-America Apartment Communities—an overlap Settling Defendant in the MDL—confirming that the States' sovereign enforcement claims remain unaffected as for reaching resolution in the States' enforcement proceedings.

form and short-form notices, and the State AGs cite no case for the proposition that a firm damages estimate is required for due process. They also ignore the many cases holding the exact opposite.[24]

The Court-approved notice ("Notice") here disclosed the settlement amounts, the allocation methodology, and the opt-out and objection rights in this MDL. It is not a disclosure about other lawsuits, filed in other courts. The States' isolated quotation of language from the summary table depends on reading untethered from the document as a whole. Obj. at 18. The Notice is captioned with this case and MDL number, identifies the presiding judge, defines "Settlements" to mean the agreements reached with the forty-one specifically named Settling Defendants in the MDL, and titles its governing summary table "Summary of Your Legal Rights and Options *In These Settlements*." Dkt. 1405-4 at 4 (emphasis added). Every disclosure in that table pertains exclusively to those defined Settlements and those that may be reached in the MDL.

The "DO NOTHING" option, which allows Settlement Class Members to "[r]etain the right to submit a claim in any future settlement," *id*., means future settlements *in this MDL* with the remaining non-settling Defendants—a group the Notice itself identifies. *Id*. at 4, 6. It is not a representation about separate, AG enforcement proceedings in other forums. The Notice nowhere references those actions, and it was not required to. The exclusion language is equally unremarkable. Opting out preserves a Class Member's right to sue "on your own" based on Released Claims. *Id*. at 8. That phrase addresses individual claim preservation; it says nothing about the independent authority of State AGs as separate sovereigns.

[24] *See In re Auto. Parts Antitrust Litig.*, 2017 WL 3499291, at *7 (E.D. Mich. July 10, 2017) ("A damages model is not needed to approve a class action settlement."); *Lane v. Facebook, Inc.*, 696 F.3d 811, 823 (9th Cir. 2012) ("[The district court] need not include in its approval order a specific finding of fact as to the potential recovery for each of the plaintiffs' causes of action. Not only would such a requirement be onerous, it would often be impossible—statutory or liquidated damages aside, the amount of damages a given plaintiff (or class of plaintiffs) has suffered is a question of fact that must be proved at trial.").

The State AGs argue (again without citation) that the notice should have disclosed the existence of parallel actions. Obj. at 17. The State AGs neglect to mention that they made the same argument in *Generics*, and the MDL court rejected it: "The Court concludes that due process did not require notifying consumers of the existence of other litigation; indeed, such information could have been confusing as the *Amici* States have not settled with Sandoz, and at this point it is impossible to determine whether and to what extent consumers could recover through that litigation." *In re Generic Pharms. Pricing Antitrust Litig.*, 2025 WL 2777570, at *5 (E.D. Pa. Sept. 26, 2025). The same is true here; it would have been confusing and inappropriate for the notice to outline every other pending litigation, particularly where any relief is purely prospective.

*Vassalle v. Midland Funding LLC*, 708 F.3d 747 (6th Cir. 2013), is not to the contrary. There, the Sixth Circuit found that a class notice failed to satisfy due process where it failed to inform class members that, by staying in the settlement, they lost their ability to vacate judgements obtained by the defendant against them in state court lawsuits. In contrast to the State AGs' speculative hopes for more damages, the class members in *Vassalle* were giving up a concrete, quantifiable interest. As the *Vassalle* court noted, "The failure of the notice to mention this fact is not just 'any ground' on which a class member might object; rather, it is the principal ground. The unnamed class members' greatest interest is their ability to contest these allegedly fraudulent judgments." *Id.* at 759. The same is not true here; Settlement Class Members are not foregoing any concrete right that the notices fail to disclose, and as the *Generics* court found, to suggest otherwise would cause unnecessary confusion.

The AGs' deficiency theory requires identifying a benefit that the Notice was required to, but did not disclose. They have identified none. No State AG action has produced—or committed to produce—a compensatory distribution to individual renters. A notice cannot be deficient for

omitting the effect of a settlement on a benefit that is entirely speculative, not yet achieved, and whose future form the States themselves have not defined.

The State AGs' cursory objection that Settlement Class Members cannot know their precise claim values until claims administration is complete fares no better. Until a settlement is approved, claims are made and evaluated, and a distribution is calculated, and particularly so when claims are distributed on a *pro rata* basis, a class member cannot know the amount of money they may get.[25] The State AGs have not identified any case where *pro rata* claims were calculated before the opt-out/objection deadline, and Settlement Class Counsel are unaware of any.

Finally, the State AGs' notice adequacy challenge comes too late. They were on notice of the proposed class notice before it issued to Settlement Class Members and raised no objection to its contents at that time.

### 3. Objection C: The State AGs' Rule 23 Superiority and Adequacy Arguments Fail on the Merits.

The State AGs argue that a private settlement class is not superior to State *parens patriae* enforcement, and that named representatives are structurally inadequate to represent Settlement Class Members who have access to State enforcement that the representatives do not share.

#### a. Superiority

As an initial matter, the Rule 23(b)(3) analysis looks at whether a class action is superior to alternative forms of litigation commenced by the class members ***in their individual capacity***,

[25] *See In re Flint Water Cases*, 571 F. Supp. 3d 746, 819 (E.D. Mich. 2021) (granting final approval of settlement and overruling objections that class members did not know the final amount of their monetary award at the time of registration). *See also* 2 McLaughlin on Class Actions §6:23 (22nd ed.) ("The methodology or formula for the calculation of a claimant's share should be described. This is all that is required, and class members usually will not know the amount they actually will receive until after final approval is granted.") (citing *Nat'l Treasury Emps. Union v. United States*, 54 Fed. Cl. 791, 806 (2002); *In re Lease Oil Antitrust Litig*. (No. II), 186 F.R.D. 403, 429-430 (S.D. Tex. 1999)).

not whether, as the State AGs suggest, a state *parens patriae* action is superior.[26] The Supreme Court has ruled decisively on this issue, stating in *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 266 (1972), that class actions are "definitely preferable" to *parens patriae* actions "in the antitrust area."

The State AGs also ignore that, if they are successful in overturning the Settlements, residents in every state that does not have a currently pending *parens patriae* action would be left with nothing. Their subset of *parens patriae* actions cannot be superior for the vast majority of Settlement Class Members for whom the class action is the only avenue for potential recovery. Weighed against that risk, the State AGs' *parens patriae* action is inferior. Also, no Settlement Class Members have objected on Rule 23(b)(3) grounds. The Proposed Class's reaction has been overwhelmingly favorable, as further detailed in Plaintiffs' Motion for Final Approval, filed contemporaneously herewith.

The State AGs' cases are inapplicable. In *Commonwealth of Pennsylvania v. Budget Fuel Co.*, 122 F.R.D. 184, 186 (E.D. Pa. 1988), the state's *parens patriae* claim was filed on the same day as the class case, and by the time the class representative sought class certification, the state had "already entered into settlement agreements with most of the nine [defendants] and [was] in the process of negotiating with the remaining [defendants]." Under the circumstances of that case, the court found that allowing the class action to proceed "would only serve to delay the swift resolution of this matter and cause unnecessary costs to the class." *Id.* at 186. The exact reasoning applies here; Plaintiffs' case preceded all of the States' actions, Plaintiffs have reached Settlements

[26] *See* Fed. R. Civ. P. 23(b)(3) advisory committee's note to 1966 amendments ("The court is to consider the interests of individual members of the class in controlling their own litigations and carrying them on as they see fit . . . . In this connection the court should inform itself of any litigation actually pending by or against the individuals.").

with the Overlap Defendants that the States now seek to impede, and allowing the States to do so would derail compensation for a nationwide class for the sake of speculative recovery for a small subset of that class.[27]

**b. Adequacy**

The State AGs argue that Settlement Class Members with access to State enforcement are structurally different from named representatives who face certification risk. That argument entirely mischaracterizes Rule 23 adequacy. "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. A class representative must be part of the class and possess the same interest and suffer the same injury as the class members."[28] The Sixth Circuit's adequacy standard asks whether representatives are aligned with the class as to the claims being certified, not whether they share every possible alternative avenue of relief. *See In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996).

Here, the named representatives share with all Settlement Class Members an identical interest in maximizing recovery on the compensatory claims before this Court. The State AGs do not deny this. That interest is not affected by the availability of State enforcement as a supplemental avenue. Settlement Class Members who prefer the speculative possibility of future recovery through state *parens patriae* actions (and the even more speculative possibility that any

---

[27] The remaining cases the State AGs cite for this proposition are equally inapplicable. *See Thornton v. State Farm Mut. Auto Ins. Co.*, 2006 WL 3359482, at *1 (N.D. Ohio Nov. 17, 2006) (class action filed after 49 state AGs had already reached a comprehensive settlement found to be inferior to state action); *Sage v. Appalachian Oil Co.*, 1994 WL 637443, at *1 (E.D. Tenn. Sept. 7, 1994) (where "State of Tennessee, apart from the Attorney General's *parens patriae* capacity under 15 U.S.C. § 15c, and as a retail purchaser of gasoline sold by defendants, also seeks to bring this action as a class action," *parens patriae* case found to be superior). The State AGs also cite a footnote in a class certification opinion in *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 434 n.11 (4th Cir. 2003) for the unremarkable observation that a court *may* decide that the proposed class action is unnecessary if there is a concurrent state action.

[28] *Amchem Prod., Inc. v. Windsor,* 521 U.S. 591, 625-26 (1997) (citation modified).

recovery would flow to the renter as opposed to state coffers) had the right to opt out.[29] Moreover, the State AGs' own adequacy argument depends on the premise that the settlements impair State enforcement of its sovereign enforcement power—the premise this Court has already rejected.

**4. Objection D: The CAFA Notice Arguments Do Not Warrant Denial of Final Approval.**

The purpose of CAFA notice is to enable State officials to assess and, if warranted, weigh in on proposed settlements.[30] That interest has been fully served. Indeed, the State AGs have now filed multiple rounds of briefing, possess state-by-state class population estimates, and have submitted a comprehensive 31-page objection (in addition to their 25 pages of briefing on their request to intervene that rehash the same arguments.) Their actions demonstrate their ability to meaningfully evaluate these settlements.

The State AGs now contend that the notice was deficient because it omitted estimated proportionate claims shares. That is not a valid concern. The proportionate share of the settlement attributable to any State's class members depends on the number and amount of verified claims submitted by those members. That figure cannot be known until the claims period closes. All that CAFA requires is a reasonable ***estimate***.[31] The state-by-state class population figures are the most reliable estimate available before claims are processed. The State AGs argue that the settlement administrator's possession of mailing addresses for potential Settlement Class Members somehow demonstrates the feasibility of providing both Settlement Class Members' individual names by

---

[29] *See In re TFT-LCD Flat Panel Antitrust Litig.*, 2011 WL 13152270, at *9 (N.D. Cal. Aug. 24, 2011) ("To the extent that there are individual consumers who feel they would be better served by their respective AGs, those consumers can opt out.").

[30] *See In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, 716 F.3d 1057, 1064-65 (8th Cir. 2013) ("Congress enacted the CAFA notice requirement to 'provide a check on inequitable settlements,' and it emphasized that the statute was 'not intended to allow settlement class members to walk away from an approved settlement based on a technical noncompliance.'") (citing S.Rep. No. 109-14 (2005), 2005 WL 627977, at *35).

[31] 28 U.S.C. §1715(b)(7)(A).

State, along with proportionate share of claims of Settlement Class Members from a given State to the entire settlement pool. However, that argument conflates two different feasibility questions and would impose a burden that Congress did not require under CAFA.[32] Indeed, the State AGs do not cite a single case in their nearly four pages of argument on this point, underscoring that their objection is without merit.

## III. CONCLUSION

For the foregoing reasons, MDL Plaintiffs respectfully request that the Court (1) deny the State AGs' motion to intervene; (2) treat the Rule 24(c) pleading objection as a statement of interest or amicus submission; (3) overrule the substantive objections on the merits; and (4) grant final approval to the proposed settlements.

Dated: September 25, 2026

*/s/ Tricia R. Herzfeld*
Tricia R. Herzfeld (#26014)
Anthony A. Orlandi (#33988)
**HERZFELD SUETHOLZ GASTEL LENISKI AND WALL, PLLC**
1920 Adelicia St., Suite 300
Nashville, TN 37212
Telephone: (615) 800-6225
tricia@hsglawgroup.com
tony@hsglawgroup.com

*Liaison Counsel*

Patrick J. Coughlin
Carmen A. Medici
Heidi B. Weaver
Bridget Gramme
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 798-5325
Facsimile: (619) 233-0508

[32] *See Uponor,* 716 F.3d at 1064-65 (granting final approval and overruling objection based on same alleged CAFA notice deficiency characterizing it as a "technical error").

pcoughlin@scott-scott.com
cmedici@scott-scott.com
hweaver@scott-scott.com
bgramme@scott-scott.com

Patrick McGahan
Amanda F. Lawrence
Michael Srodoski
G. Dustin Foster
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06145
Telephone: (860) 537-5537
Facsimile: (860) 537-4432
pmcgahan@scott-scott.com
alawrence@scott-scott.com
msrodoski@scott-scott.com
gfoster@scott-scott.com

Matthew J. Perez
Daniel F. Loud
Fatima Brizuela
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
230 Park Ave., 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
matt.perez@scott-scott.com
dloud@scott-scott.com
fbrizuela@scott-scott.com

Stacey Slaughter
Thomas J. Undlin
Geoffrey H. Kozen
J. Austin Hurt
Caitlin E. Keiper
Navy A. Thompson
Sam R. Black
Eric P. Barstad
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
Facsimile: (612) 339-4181
sslaughter@robinskaplan.com
tundlin@robinskaplan.com

gkozen@robinskaplan.com
ahurt@robinskaplan.com
ckeiper@robinskaplan.com
nthompson@robinskaplan.com
sblack@robinskaplan.com
ebarstad@robinskaplan.com

Swathi Bojedla
Daniel J. Walker
**HAUSFELD LLP**
1200 17th Street, Suite 600
Washington, DC 20036
Telephone: (202) 540-7200
sbojedla@hausfeld.com
dwalker@hausfeld.com

Gary I. Smith, Jr.
Samuel Maida
**HAUSFELD LLP**
580 California Street, 12th Floor
San Francisco, CA 94111
Tel: (415) 633-1908
gsmith@hausfeld.com
smaida@hausfeld.com

Mindee Reuben
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 985-3270
mreuben@hausfeld.com

Shayla J. Harris
Jacob R. Leiken
Mary Frances Brown
**HAUSFELD LLP**
33 Whitehall St., 14th Fl.
New York, NY 10004
Telephone: (646) 357-1100
sharris@hausfeld.com
jleiken@hausfeld.com
mbrown@hausfeld.com

*Interim Co-Lead Counsel*

Eric L. Cramer
Michaela L. Wallin
Taylor Hollinger
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
ecramer@bm.net
mwallin@bm.net
thollinger@bergermontague.com

Brendan P. Glackin
Dean M. Harvey
Jules A. Ross
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, Suite 2900
San Francisco, CA 94111
Telephone: 415-956-1000
bglackin@lchb.com
dharvey@lchb.com
jross@lchb.com

Mark P. Chalos
Hannah R. Lazarz
Kenneth S. Byrd
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
222 2nd Avenue South, Ste. 1640
Nashville, TN 37201
(615) 313-9000
mchalos@lchb.com
hlazarz@lchb.com
kbyrd@lchb.com

Benjamin J. Widlanski
Robert J. Neary
Cameron A. Moody
Brandon M. Sadowsky
**KOZYAK TROPIN & THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800
bwidlanski@kttlaw.com
rn@kttlaw.com

Christian P. Levis
Vincent Briganti
Peter Demato
Radhika Gupta
Nicole A. Veno
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
vbriganti@lowey.com
clevis@lowey.com
pdemato@lowey.com
rgupta@lowey.com
nveno@lowey.com

Christopher M. Burke
Yifan (Kate) Lv
Amelia F. Burroughs
Rachel Steyer
**BURKE LLP**
402 W. Broadway, Suite 1890
San Diego, CA 92101
Telephone: (619) 369-8244
Facsimile (314) 241-3525
cburke@burke.law
klv@burke.law
afb@burke.law
rsteyer@burke.law

Joseph R. Saveri
Cadio Zirpoli
Kevin E. Rayhill
Alexandra S. Fernandez
**SAVERI LAW FIRM, LLP**
550 California St., Ste. 910
San Francisco, CA 94104
Telephone: (415) 500-6800
jsaveri@saverilawfirm.com
czirpoli@saverilawfirm.com
krayhill@saverilawfirm.com
afernandez@saverilawfirm.com

Jennifer W. Sprengel
Daniel O. Herrera
Nyran Rose Rasche

cmoody@kttlaw.com
bsadowsky@kttlaw.com

Kaitlin Naughton
Mohammed A. Rathur
Christopher P. Dolotosky
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, IL 60603
Telephone: 312-782-4880
Facsimile: 312-782-4485
jsprengel@caffertyclobes.com
dherrera@caffertyclobes.com
nrasch@caffertyclobes.com
knaughton@caffertyclobes.com
mrathur@caffertyclobes.com
cdolotosky@caffertyclobes.com

*Plaintiffs' Steering Committee Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*/s/ Tricia R. Herzfeld*
Tricia R. Herzfeld